Dear Secretary Angelle:
You have requested an opinion of this Office regarding the meaning and significance of certain provisions of Act 626 of the 2006 Regular Session of the Louisiana Legislature. The questions relate to who retains certain mineral rights beneath land that emerges from State water bottoms as a result of coastal reclamation activities. Specifically, you ask the following questions:
 1.) Is there a constitutional prohibition against granting private landowners perpetual mineral interests to land that can erode and become State water bottoms by operation of law?
 2.) Would such a perpetual mineral interest agreement with private landowners and regulations developed to provide for such agreements be consistent with the charges of Act 626?
 3.) Is there a constitutional prohibition against perpetual transfers of mineral rights to a person with the right to reclaim eroded land?
 4.) If there is a constitutional prohibition against perpetual transfers of mineral rights to a person with the right to reclaim eroded land, would the right only become effective when the land emerges from the water via a reclamation project?
 5.) Would an agreement granting perpetual mineral rights to a person with the right to reclaim eroded land be consistent with Act 626?
 6.) Is there a constitutional prohibition against a perpetual transfer of mineral rights to a person with the right to reclaim eroded land if the emergent land later re-erodes and becomes a State water bottom by operation of law? *Page 2 
 7.) Would a scenario such as that where perpetual mineral rights are granted to a person with the right to reclaim eroded land if the emergent land later re-erodes and becomes a State water bottom by operation of law be consistent with the charges of Act 626?
None of the answers to these questions are simple and all of them require a basic appreciation of the law of State interests in eroded lands, reservations of mineral servitudes from the State, and the purpose and effect of Act 626. Each of the questions will be answered in order following a brief review of these areas of the law.
State Interests in Eroded Lands
The basis for the State's interest in eroded land[1] is articulated in the Louisiana Constitution. The relevant parts of the 1974 Constitution are found within Article IX, and state, in pertinent part:
 Section 3. The legislature shall neither alienate nor authorize the alienation of the bed of a navigable water body, except for purposes of reclamation by the riparian owner to recover land lost through erosion.
 Section 4. The mineral rights on property sold by the state shall be reserved . . . The mineral rights on land, contiguous to and abutting navigable waterbottoms reclaimed by the state through the implementation and construction of coastal restoration projects shall be reserved, except when the state and the landowner having the right to reclaim or recover the land have agreed to the disposition of mineral rights, in accordance with the conditions and procedures provided by law.
The above-quoted portions of the Louisiana Constitution make it clear that the only way for the State to alienate navigable water bottoms is through a reclamation project to recover land that originally belonged to the riparian owner, but which has now eroded into a navigable water body. Additionally, it is black letter law that as private lands erode into navigable water bodies, that new water bottom becomes the property of the State.[2] *Page 3 
Mineral interests lying beneath such eroded property are subject to the oil and gas lease "freezing statute."[3] This law provides that the mineral rights held by the riparian owner at the time erosion occurs are retained by the riparian owner for as long as existing mineral leases on that land are in effect. Once these active leases are no longer in effect, the mineral interests under the eroded land reverts to the current owner — the State. Vice versa, if State-owned water bottoms on "rivers or other streams" subject to a State mineral lease becomes privately-owned by virtue of accretion, the mineral interests under the accreted land reverts to the then-current owner — the private landowner.
Thus, a simple reading of La.Const. Art. IX, Sec. 3 in connection with the statutory provisions cited above, leads to the impression that, once all active leases have expired on eroded lands, the State owns both the eroded land and the mineral rights thereunder. However, this truism, which does work in most circumstances, must be tempered by the language of La.Const. Art. IX, Sec. 4.
Coastal land loss through erosion is nothing new to the residents of South Louisiana.[4] It is a harsh reality that our coastline is disappearing into the Gulf of Mexico at an alarming rate due to both natural and anthropogenic factors.[5] In an effort to slow, or perhaps even stem, this process, the Legislature and the people of the State have, over time, added numerous laws to the books. Among those provisions is Section 4 to Article IX of the 1974 Louisiana Constitution. Portions of this Section establish the respective rights of the State and riparian owners with respect to minerals once the surface has become a navigable water body. Section 4 provides, as a default scenario, that when formerly submerged lands emerge, the State shall reserve the mineral rights under the reclaimed land. However, Section 4 also contemplates that this emergent land[6] can, by contract between the State and the riparian owner, have a different mineral ownership scheme than the default. According to the procedures established by law, which must be in harmony with other constitutional and statutory provisions, the State may reassign certain mineral interests lying beneath eroded lands. Act 626 of the 2006 Regular Session of the Louisiana Legislature, discussed more fully below, is one of these laws that provides for the establishment of alternative (i.e., non-default, non-State) ownership of mineral rights following reclamation. *Page 4 
Reservations of Mineral Servitudes from the State
As a general rule, when land is expropriated by the State, the original landowner may retain a perpetual mineral servitude for so long as the property is in the possession of the State.[7] However, this general rule does not apply to eroded lands. Once eroded and, if applicable, at the termination of mineral leases protected by the freezing statute, the mineral interests become one with the newly created water bottoms of navigable waterways — making all surface and subsurface interests the property of the State in its sovereign capacity.[8] The point of this discussion is simple: the reservation of mineral rights by landowners provided for in the Mineral Code does not necessarily apply to situations of eroded lands.
The Purpose and Effect of Act 626
Act 626 of the Louisiana Legislature's 2006 Regular Session amended and reenacted La.R.S. 41:1702(D)(2)(a). Its stated purposes included granting the Secretary of the Department of Natural Resources ("DNR") the authority to enter into agreements
 concerning the acquisition of land by certain entities for coastal projects . . . to provide for the adoption of rules and regulations [to facilitate these ends, and] to provide relative to agreements concerning ownership of minerals . . .[9]
Basically, Act 626 falls into line with the other laws of recent vintage aimed at slowing or stemming the land loss problems of coastal Louisiana. It attempts to achieve this goal by providing for expanded powers that the State can use to implement its reclamation plans. More specifically, though, Act 626 attempts to provide a mechanism to resolve ownership issues with respect to reclaimable property, with its key ingredient being the preservation of the State's right of access to such property to maintain its coastal protection and restoration projects.
No comprehensive review of land law in Louisiana is complete without a discussion of mineral rights and this opinion is no exception. Many of the mineral provisions of this Act and those contained in the already-existing La.R.S. 41:1702(D)(2)(a)(i) exist to ensure than mineral interests will not interfere with the primary purpose of reclaiming eroded lands to facilitate coastal restoration and protection, and encourages the cooperation of the private landowner — if needed or desired — in any such reclamation project. It is the opinion of this Office that *Page 6 
Act 626 does not materially alter the existing law regarding the ownership of minerals on State water bottoms or eroded lands. Subject to that caveat, we now turn to the specific questions of your opinion request.
Question 1
The language of La.Const. Art. IX, Sec. 3, when combined with La.C.C. Art. 450 is clear: as land erodes into navigable waterways, it becomes the property of the State, along with its underlying minerals.[10] We do not see Act 626 or La.R.S. 41:1702(D)(2)(a)(i) as conflicting with this mandate. As to emergent lands, the law is now clear:
 agreements [between the State and the riparian owner] may . . . provide for a limited or perpetual alienation or transfer, in whole or in part, to such owner of subsurface mineral rights owned by the state . . . that are subject to such owner's right of reclamation . . .[11]
In other words, the State has the option to transfer back to the riparian owner the mineral interests under emergent lands. It is the opinion of this Office that in order for such a transfer to be constitutional under the mandates of La.Const. Art. IX, Sec. 3 and La.C.C. Art. 450, that the term "perpetual" as used in Act 626 and La.R.S. 41:1702(D)(2)(a) must be interpreted as referring to the perpetual life of the emergent land.[12]
If and when that emergent land again erodes into a navigable waterway, the life of that land has expired and so too would any agreement for a perpetual interest in the underlying minerals.[13]
We base this interpretation on two factors. First, the language of La.R.S. 41:1702(D)(2)(a)(i) specifically states that the agreement transferring the mineral interests of emergent lands from the State to the riparian owner is tied to the classification of that land as emergent. Thus, it is only logical to conclude that, once the land is no longer emergent — i.e., it has re-eroded into a navigable waterway — the authority of the State to transfer those rights evaporates. Second, and more importantly, it is apparent that La.R.S. 41:1702(D)(2)(a) was constructed to avoid the prohibition in La.Const. Art. VII, Sec. 14(A) against the donation of State assets. Specifically, the law states that the mineral rights may be granted back to the riparian owner *Page 6 
 . . . in exchange for the owner's compromise of his ownership and reclamation rights within such area and for such time as the secretary deems appropriate and in further exchange for the owner's agreement to allow his existing property to be utilized in connection with the project to the extent deemed necessary by the secretary.[14]
In other words, pursuant to La.Const. Art. IX, Sec. 3, riparian owners have the right to reclaim eroded lands on their own. In exchange for allowing the State to exercise this private right and then to intrude on this private property for the purposes of coastal restoration and protection projects, the State will grant certain mineral interests to the riparian owner. In essence, it is our opinion that what the law establishes is a process for the State to enter into cooperative endeavor agreements with the riparian owners under La.Const. Art. VII, Sec. 14(C). Such agreements allow the State to "donate" certain rights — in this case mineral rights — in exchange for something of value that furthers a public purpose-in this case the right to enter and use private land for coastal restoration and protection. This quid pro quo is absolutely necessary for the State's grant of mineral rights to be constitutional. Accordingly, if and when the emergent land re-erodes, the quid pro quo is gone — the State can no longer access private property for coastal restoration and protection purposes, absent, of course, a later reclamation agreement with the private riparian landowner. When this occurs, the constitutional basis — the quid pro quo — for the "donation" of the mineral rights ceases to exist and those rights revert to the State just as they did, by operation of law, when the land eroded in the first instance.
Thus, it is our opinion that there is no constitutional prohibition against the granting of perpetual mineral rights to riparian owners for land that may re-erode, because the term perpetual in this instance refers to the life of the emergent land. Additionally, such agreements must be accomplished pursuant to the quid pro quo scheme envisioned by La.R.S. 41:1702(D)(2)(a)(i) and mandated by La.Const. Art. VII, Sec. 14(C).
Question 2
We opine, subject to the limitations noted in the previous section of this opinion, that agreements with riparian owners and regulations to effectuate such agreements are precisely what the Legislature contemplated with the passage of Act 626. Act 626 is clear that the exercise of any mineral interests must be subordinate to the coastal restoration and protection activities authorized by that and other legislation. Thus, in order to be in complete compliance with Act 626, it is the opinion of this Office that regulations providing for agreements with riparian owners and the agreements themselves must be drafted to explicitly outline this *Page 7 
subordinate relationship. Failure to do so would cause such regulations and agreements to run afoul of Act 626.
Question 3
The answer to Question 3 is largely repetitive of the answer given to Question 1. Accordingly, per our discussion in response to Question 1, we are of the opinion that there is no constitutional prohibition against the granting of perpetual mineral rights to a person with the right to reclaim eroded lands. Although such may constitute a prohibited donation under normal circumstances, the quid pro quo aspect of La.R.S.41:1702(D)(2)(a)(i) and Act 626, coupled with the reality that the term "perpetual" refers to the life of the emergent land, it is our opinion that no such prohibited donation would occur under the circumstances outlined in your request.[15]
Another component to this question could be whether an agreement may be made with a riparian owner who does not currently own the property due to the fact that, before the perfection of such an agreement,all of the former land lies under the water of a navigable water body. Following that argument to its end, we would hypothesize that, because the riparian owner owns no such land, he cannot agree to limitations to the use of the land. Essentially, then, the question becomes whether the State would be donating its mineral rights for nothing in return. It is the opinion of this Office that such would not be the case. Although the riparian owner does not currently have ownership of the land, he does have a right to reclaim it, and the possibility exists that accretion will take place by natural causes. Part of what the State gains under La.R.S. 41:1702(D)(2)(a)(i) in exchange for donating its mineral interests to the riparian landowner is the right to exercise the riparian owner's right to reclaim. Due to the dire need for coastal restoration and protection in Louisiana, it seems to us impossible to legitimately argue that this right alone does not serve a substantial public purpose. Additionally, the riparian owner often must grant access across his existing, non-submerged property to allow the reclamation to occur. Accordingly, we believe that the exchange of these rights is sufficient to support a cooperative endeavor agreement under La.Const. Art. VII, Sec. 14(C) as well as to satisfy the requirements of Act 626 prior to the emergence of the land. The remainder of the exchange of rights would merely be conditional in the agreement between the State and the riparian owner, contingent upon the emergence of the eroded land.
Question 4
Part of Question 4 is moot based on our answer to Question 3. This is the part that asks "if there is a constitutional prohibition under Question 3 . . ." Because we *Page 8 
are of the opinion that no such prohibition exists, we do not see a need to answer this part of the question.
However, Question 4 does raise an as-yet unconsidered issue: when does the riparian owner's right to the minerals under the once eroded land attach? It is a basic tenet of obligations that a conditional agreement cannot occur until the happening of the event (the "suspensive condition") upon which that agreement depends.[16] Accordingly, it is our opinion that, though the State may begin to work on reclamation projects not long after the perfection of the Act 626 agreements with riparian owners, the condition upon which these agreements is based is the emergence of once-eroded land from navigable waterways. Thus, until the land emerges from the water, it is our opinion that the riparian owner's rights in the underlying minerals have not vested. This conclusion also supports the conclusion in Question 3, as it puts less risk on the State in terms of the value of its donation until the land is reclaimed — serving the coastal restoration purpose then takes center stage in any of these agreements (as mandated by Act 626) and the State retains its mineral rights until the land emerges and the coastal restoration purpose is fulfilled.
Question 5
Based on our answers to Questions 1 through 4, it is our opinion that agreements granting perpetual mineral rights to a person with the right to reclaim eroded land are consistent with Act 626.
Question 6
As has been discussed at length in the answers to the questions above, it is our opinion that there is no constitutional prohibition against granting a perpetual transfer of mineral rights to a private party on land that may eventually re-erode into a navigable waterway. As noted above, the term "perpetual," when considered in the context of the constitutional articles relevant to this matter and the thrust of Act 626, must be interpreted to refer to the perpetual life of the emergent land. Because of this reality, once the emergent land again becomes part of a navigable water bottom, the traditional rules of ownership will kick back in,[17] returning the land and the underlying minerals to the State as the land re-erodes into a navigable waterway. All parties to the agreement will then be returned to their pre-agreement positions, with both (hopefully) gaining something in the process — the State will have an opportunity to stall coastal erosion in the area covered by the agreement and the riparian owner has the opportunity to access mineral interests for the duration of the existence of the emergent land. *Page 9 
Question 7
The answer to this question is largely contained within the answers to the foregoing questions. It is the opinion of this Office that the granting of perpetual rights to riparian owners for land that may re-erode is consistent with the charges of Act 626 provided that the term "perpetual" means that the rights are tied to the life of the reclaimed land. When the land's status changes — when it becomes again the inundated water bottom of a navigable waterway — then the rights of the riparian owner evaporate and the State, once again, retains those rights consistent with La.Const. Art. IX, Sec. 3 and La.C.C. Art. 450.
Summary
We see no constitutional problems with regulations made to flesh out the authority of the State under Act 626 of the 2006 Regular Legislative Session. As long as perpetual mineral rights run with the life of the emergent land, there is no unconstitutional donation of property under La.Const. Art. VII, Sec. 14(A) and no running afoul of the provisions of La.Const. Art. IX, Sec. 3. The agreements envisioned by La.R.S.41:1702(D)(2)(a)(i) and Act 626 are, in effect, cooperative endeavor agreements with the riparian owners to accomplish the important goal of coastal restoration and protection.
As a general rule, the law and long-standing public policy favors the unity of property interests. This general principle is achieved with respect to mineral rights to emergent lands by, once emerged, granting the mineral rights to the riparian owner — the owner of the emerged lands. The principle is similarly achieved when the property goes the other way — from land to water bottom — by returning the mineral rights to the State if and when the land re-erodes, thereby uniting the "surface" and mineral ownership of the water bottom. That is, the water bottom "surface" devolves to State ownership by operation of law upon erosion, along with the mineral interests, both of which return to the State by the dissolving of the cooperative endeavor agreement.
We hope that this adequately answers all of your questions. If we can be of further assistance, please contact us.
 Sincerely,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 By:________________________ Ryan M Seldemann Assistant Attorney General
 CCF, Jr/RMS/tp
[1] The term "eroded land" is used in this opinion as a term of art to refer to any property that has submerged below the surface of a navigable water body, be it through erosion, subsidence, or other means. The term "erosion" is also used as a general term of art to refer to a broad swath of mechanisms by which property can become submerged below a navigable water body.
[2] La.C.C. Art. 450; A.N. Yiannopoulos, Property, 2 Louisiana Civil Law Treatise § 65, and the authorities cited therein.
[3] La.R.S. 9:1151.
[4] See generally, Ryan M. Seidemann, Louisiana Wetlands and WaterLaw: Recent Jurisprudence and Post-Katrina and Rita Imperatives, 51 LOY. L.REV. 861 (2006).
[5] See generally, Ryan M. Seidemann and Catherine D. Susman, WetlandsConservation in Louisiana: Voluntary Incentives and Other Alternatives, 17 J. ENVTL. L. LIT. 441 (2002).
[6] It should be noted that the status of land as being "emergent" determines the legal rights attached to that land. In other words, emergent land is singled out for special treatment by the law of Louisiana because of its classification as "emergent" and the public benefits that stem from land reclamation. Accordingly, when the land is no longer "emergent" (i.e., it once again becomes submerged beneath a navigable water body), it loses its "emergent" classification and the special treatment attached thereto.
[7] La.R.S. 31:149. It should be noted that this provision of the Mineral Code applies not only to State expropriation, but to property expropriated by any "expropriating authority." See, La. Atty. Gen. Op. No. 07-0147.
[8] La. Atty. Gen. Op. No. 81-274.
[9] Act 626 of 2006, preamble.
[10] See, Yiannopoulos, supra. All of this is subject to the reservations of the freezing statute.
[11] La.R.S. 41:1702(D)(2)(a)(i) (emphasis added).
[12] Note that this interpretation must be applied to all land covered within the scope of La.R.S. 41:1702(D)(2)(a). To do otherwise would lead to a donation of State assets in violation of La.Const. Art. VII, Sec. 14(A) once any land that such an agreement has been confected for once again becomes a navigable water bottom. In that situation, the Constitution must be followed and the water bottom falls to State ownership once again under La.Const. Art. IX, Sec. 3.
[13] Again, subject to the limitations provided for in the freezing statute.
[14] La.R.S. 41:1702(D)(2)(a)(i).
[15] Obviously, if a quid pro quo is granted to the "donor", the instrument of agreement is not a true donation.
[16] See, La.C.C. Art. 1767 (referring to suspensive conditions).
[17] As defined in La.C.C. Art. 450.